## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Kellan A. F.,[1] | ) | C/A No.: 1:25-8486-DCC-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND |
| Frank Bisignano, Commissioner of | ) | RECOMMENDATION |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civ. Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying his claims for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether he applied the proper legal standards. For the reasons that follow, the undersigned recommends the Commissioner's decision be reversed and remanded for further proceedings as set forth herein.

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

I.    Relevant Background

    A.    Procedural History

On September 9, 2021, Plaintiff protectively filed an application for DIB in which he alleged his disability began June 25, 2021. Tr. at 256–57, 258. He protectively filed an application for SSI on August 2, 2022. Tr. at 260–66. His applications were denied initially and upon reconsideration. Tr. at 102–06, 115–18, 119–23. On September 10, 2024, Plaintiff had a hearing by telephone before Administrative Law Judge ("ALJ") Lauren K. Tran. Tr. at 39–69 (Hr'g Tr.). The ALJ issued an unfavorable decision on October 24, 2024, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 14–38. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–6. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on July 27, 2025. [ECF No. 1].

    B.    Plaintiff's Background and Medical History

        1.    Background

Plaintiff was 28 years old at the time of the hearing. Tr. at 41. He attended three years of college, but did not complete his degree. Tr. at 46. His past relevant work ("PRW") was as a barista and a cashier. Tr. at 65.  He alleges he has been unable to work since June 25, 2021. Tr. at 258.

2. Medical History

Plaintiff reported that prior to his alleged disability onset date, he received inpatient treatment for suicidal ideations at Three Rivers in 2017 and Richland Springs in 2019 and outpatient treatment with Ajay Sood, M.D., Medical University of South Carolina ("MUSC") Institute of Psychiatry, and Lexington County Community Mental Health Center ("LCCMHC"). Tr. at 390. He indicated he had previously been prescribed Abilify, Prozac, Lamictal, Lexapro, Remeron, Effexor, and Klonopin. *Id.*

On September 6, 2020, Plaintiff telephoned Lourdes Tepper, LPC ("Counselor Tepper"), and indicated he wanted to go to the emergency room ("ER"), as he had been experiencing suicidal ideations over the prior week and had attempted to overdose with Lyrica two days prior. Tr. at 376. He reported his suicidal ideations had worsened such that he was tearful and could not think or concentrate. *Id.* He endorsed racing thoughts and inability to shut off his mind and noted he had not slept in four or five days. *Id.* Counselor Tepper directed Plaintiff to find a coworker to drive him to the ER at Richland Hospital and contacted Richland Hospital to advise that he was on the way. *Id.*

Plaintiff followed up with nurse practitioner Deborah Whatley ("NP Whatley") by telephone on September 10, 2020. Tr. at 378. He reported he had recently moved out on his own and had become suicidal, as he was

having difficulty meeting his financial obligations. *Id.* He noted he had visited the ER, been given Melatonin and Trazodone, and had slept for 19 hours. *Id.* NP Whatley noted normal observations on mental status exam ("MSE"), with fair judgment and insight. Tr. at 379. She discontinued Lyrica and Strattera due to ineffectiveness and prescribed Adderall XR 20 mg, Trazodone 150 mg, and Zoloft 150 mg. Tr. at 379, 380.

On December 21, 2020, Plaintiff presented to LCCMHC to reestablish treatment and undergo an initial clinical assessment. Tr. at 389–97, 400. He reported suicidal ideations, depression, and anxiety were affecting his work. Tr. at 389. Plaintiff endorsed the following symptoms on mental health screening tests: little interest in doing things, feeling depressed, trouble sleeping, feeling tired, poor appetite, feeling bad about self, trouble concentrating, moving or speaking slower, thoughts he would be better off dead, feeling nervous, inability to stop worrying, worrying too much, restlessness, easily annoyed, feeling afraid something awful will happen, getting less sleep without missing it, racing thoughts, easily distracted, feeling uninterested, and anxious when meeting people. *Id.* He said his medications included Zoloft, Vraylar, Trazodone, and Gabapentin. Tr. at 390. He endorsed daily use of a nicotine vape and a history of daily cannabis use, with his last use one year prior. Tr. at 391. He reported he had previously been in an emotionally-abusive relationship that led to nightmares and

4

distressing memories. Tr. at 394. He indicated he had been compliant with medications, but had difficulty keeping appointments when they were over the phone instead of in-person. Tr. at 396. Sarah Norris, LMSW ("SW Norris"), recorded mostly normal findings on MSE, aside from suicidal ideations without a plan, fair judgment, limited insight, nightmares, decreased appetite, and fatigue. Tr. at 394–95. Her diagnostic impressions were unspecified depressive disorder, unspecified trauma- and stressor-related disorder, moderate cannabis use disorder in early remission, and generalized anxiety disorder ("GAD"). Tr. at 395. She helped Plaintiff develop a safety plan. Tr. at 398.

During a telephone visit on January 13, 2021, Plaintiff denied suicidal thoughts. Tr. at 402. He reported his depression and anxiety levels remained high, but Vraylar, Zoloft, and Trazodone were providing some relief. *Id.* He reported he had not been taking Adderall recently, as he needed it less while he was out of work. *Id.* He requested Gabapentin for his anxiety. *Id.* Nurse Lysa Del Grosso ("Nurse Del Grosso") agreed to request refills and a new prescription for Gabapentin. *Id.* On January 19, 2021, NP Whatley authorized samples of Vraylar and prescriptions for Zoloft and Gabapentin. Tr. at 404–05.

Plaintiff denied suicidal thoughts during a telephone visit with Susan Fuller, LPC-A ("Counselor Fuller"), on January 27, 2021. Tr. at 409. He said he was doing a bit better. *Id.*

Plaintiff participated in a video visit with NP Whatley on March 8, 2021. Tr. at 411. He endorsed debilitating anxiety, panic attacks, feelings of dread, and decreased interest, energy, and concentration. *Id.* NP Whatley noted the following abnormalities on MSE: appeared unkempt, was easily tearful, had depressed mood, flat affect, mildly impaired recent and remote memory, attention, and concentration, and demonstrated fair judgment and insight. Tr. at 411–12. Plaintiff indicated he had resumed picking up a few shifts at Starbucks. Tr. at 412. NP Whatley assessed severe, recurrent major depressive disorder ("MDD") and GAD. *Id.* She discontinued Vraylar and prescribed Rexulti. *Id.*

Plaintiff participated in a video visit the following day with Mandy Williams, MS, LPC ("Counselor Williams"). Tr. at 414. He endorsed problems with depression and significant anxiety, but denied suicidal thoughts. *Id.*

On April 28, 2021, Plaintiff presented to the ER at Baptist Columbia Hospital by ambulance. Tr. at 454. He explained he had been experiencing fleeting suicidal thoughts, had contacted LCCMHC to request medication refills, had become agitated, and had commented that he was trying "not to kill myself" by requesting the medications. *Id.* He indicated he subsequently

6

arrived at home and engaged in exercises to calm down before emergency medical services ("EMS") arrived at his house and insisted on bringing him in for an evaluation. *Id.* He stated he was not currently suicidal and did not require inpatient treatment. *Id.* Joseph Campbell, M.D. ("Dr. Campbell"), examined Plaintiff and discharged him to return home. *Id.*

Plaintiff participated in a visit by telephone with NP Whatley on May 24, 2021. Tr. at 415. He said he was working two days per week and doing well on Rexulti, although he felt a higher dose was needed. *Id.* NP Whatley increased Plaintiff's Rexulti dose to 2 mg and provided samples, as Plaintiff sorted out his insurance situation. *Id.*

Plaintiff participated in a telephone visit with NP Whatley on May 25, 2021. Tr. at 419. He reported he had stopped taking Rexulti because he did not feel it was helping and had ended up going "downhill quick" and taking time off from his job. *Id.* NP Whatley recorded normal findings on MSE, aside from fair insight and judgment. Tr. at 420. She noted Plaintiff's current medications included Gabapentin 600 mg twice a day, Wellbutrin SR 200 mg daily, Trazodone 150 mg at bedtime, Rexulti 2 mg daily, and Zoloft 150 mg daily, and she refilled Gabapentin and Zoloft. *Id.*

Plaintiff participated in a medication monitoring visit on July 27, 2021. Tr. at 421. He stated his medications were partially working and endorsed anxiety, depression, and lack of focus. *Id.* He indicated he had lost his job,

moved in with his parents, and did not desire to leave his bed. Tr. at 422. Nurse Del Grosso observed Plaintiff to appear slightly disheveled, partially groomed, and calm, but agitated. *Id.* She suggested Plaintiff consult a nutritionist, but Plaintiff was resistant to the idea. *Id.* She prescribed a 30-day supply of Rexulti and said she was hopeful that Plaintiff would qualify for a prescription assistance plan to cover it in the future, as his insurance would expire on July 31, 2021. *Id.*

Plaintiff met with Christopher Hipp ("Mr. Hipp") at LCCMHC to develop a plan of care on August 5, 2021. Tr. at 424. He denied current suicidal and homicidal ideation. *Id.*

On October 19, 2021, Plaintiff presented to LCCMHC to obtain a three-month supply of Rexulti. Tr. at 425. He reported variable depressed and anxious mood and decreased energy and noted he had been approved for prescription assistance through Wellvista. Tr. at 426. He expressed his thoughts that therapy would not be helpful. *Id.* He felt that the combination of Rexulti, Zoloft, and Wellbutrin was working well, but indicated he did not believe he could return to work. *Id.* An MSE was mostly normal, aside from disheveled appearance, anxious mood and affect, and fair judgment and insight. Tr. at 427. NP Whatley refilled Wellbutrin, Gabapentin, Trazodone, Zoloft, and Rexulti. *Id.*

On January 11, 2022, Plaintiff's father brought him to LCCMHC because he was tearful, suicidal, and planned to overdose on Rexulti. Tr. at 430. Plaintiff reported panic attacks, high anxiety, increased depression, decreased interest, and poor sleep. *Id.* He agreed to resume therapy. *Id.* Nurse Del Grosso observed depressed and anxious mood, active suicidal ideation, and fair judgment and insight, in addition to normal findings. Tr. at 431. They developed a safety plan for Plaintiff's father to take control of and dispense his medications. Tr. at 430.

NP Whatley conducted a visit with Plaintiff by telephone on April 13, 2022, as Plaintiff lacked transportation to visit the office. Tr. at 714. She noted Plaintiff had an irritable and angry tone. *Id.* He requested Klonopin, and NP Whatley declined to prescribe it, explaining that benzodiazepines were for short-term use and had negative long-term effects. *Id.* She advised Plaintiff that he would need to transition his treatment to include therapy if he desired benzodiazepines to be prescribed. *Id.* Plaintiff reluctantly agreed to participate in therapy. *Id.* He endorsed anxious mood, panic attacks, chronic worry, somatic symptoms, social anxiety, feeling overwhelmed, and poor sleep, but generally denied depressive symptoms. *Id.* Plaintiff rejected a recommendation from NP Whatley and Merrie A. Cherry, M.D., that he start Trintellix and Abilify. Tr. at 716. NP Whatley discontinued Wellbutrin, as increased anxiety was among its potential side effects. Tr. at 717.

Plaintiff was admitted to Richland Springs Hospital on April 28, 2022, after presenting to the ER the prior day for suicidal ideation with a plan to overdose on prescription medication. Tr. at 495. He indicated he had presented to LCCMHC two weeks prior with increased anxiety and NP Whatley had discontinued Wellbutrin XL. *Id.* He stated he had contacted LCCMHC on April 22 to report increased anxiety and request Klonopin, but his request was denied, and he declined the offer of Abilify and Trintellix. Tr. at 495–96. He explained his grandfather subsequently passed away on April 23, and he argued with his uncle on April 27. Tr. at 496. He noted this course of events had led to him developing suicidal ideation and a plan to overdose using his medications. *Id.* He stated he requested the key to the safe where his medications were held and pushed both his mother and father after they refused to give him the key. *Id.* He notes EMS was subsequently called and he was transported to the ER. *Id.*

Plaintiff reported episodes of suicidal ideation that occurred every few weeks to months. *Id.* He stated his anxiety was bothering him more than depression, as he had experienced recurring thoughts of being a burden on his family, but had not felt depressed, had slept okay, lacked anhedonia, denied guilt, aside from that associated with pushing his mother, and had been able to concentrate on tasks. *Id.* He admitted he had been using Delta 8 tetrahydrocannabinol ("THC") daily over the prior two months. *Id.*

An MSE was mostly normal, aside from anxious, worried, and tearful mood and affect, some circumstantial thoughts, and fair judgment and insight. *Id.* Plaintiff did not meet diagnostic criteria for a major depressive episode during his hospitalization. Tr. at 499. Kimberly Kruse, M.D. ("Dr. Kruse"), performed psychological testing that showed: "Personality factors surrounding borderline personality disorder [("BPD"] are evidenced in playing a primary role in the patient's current presentation." *Id.* Plaintiff "endorsed a pervasive pattern of instability with interpersonal relationships, an unstable self image, recurrent suicidal ideation, affect instability due to mood reactivity, and difficulty with controlling anger." Tr. at 500. Dr. Kruse noted that: "Based on this history provided by the patient, psychological testing performed this admission and the patient's current presentation this admission and on record review, he met the criteria for a diagnosis of borderline personality disorder." *Id.*; *see also* Tr. at 634. Rexulti and Zoloft were discontinued during Plaintiff's hospitalization. Tr. at 502. Plaintiff was discharged on May 4, 2022, with prescriptions for Gabapentin 300 mg three times a day, Lamictal 25 mg nightly, Trazodone 100 mg at bedtime, and Nicorette gum 2 mg. Tr. at 501–02.

On May 9, 2022, Plaintiff met with nurse Joan Morton ("Nurse Morton") at LCCMHC. Tr. at 719. He refused to discuss his reason for hospital admission and communicated his plan to seek treatment elsewhere.

11

*Id.* He denied depression, endorsed anxiety, and said his anxiety was preventing him from doing important things. *Id.* Nurse Morton described Plaintiff as "irate." *Id.*

On May 16, 2022, Plaintiff presented to A. Nicholas DePace, Ph.D. ("Dr. DePace"), for a consultative MSE. Tr. at 726–29. He reported he had been unable to complete his bachelor's degree and had difficulty holding a job for an extended period because of suicidal ideation. Tr. at 726. He said he was living with his parents because he could not afford to live on his own and had not dated since 2016. *Id.* He described a typical day to include waking at 7:00 AM, making breakfast and going outside, raking or pulling weeds if he felt motivated, listening to music, and doing some chores at times. Tr. at 727. He said he had difficulty focusing to read and had not played video games in six months. *Id.* He stated he had surrendered his driver's license years earlier, as he had experienced panic attacks while driving. *Id.* He reported using his phone to access the internet, although he denied communicating with others online and using social media. *Id.* He said he interacted with his parents over the course of a regular week and with his grandmother about once a month. *Id.* He indicated his parents managed his money because he was disorganized and impulsive. *Id.* He reported a history of three inpatient psychiatric hospitalizations and noted he had been released from the hospital the prior

week. *Id.* He endorsed low energy, difficulty getting out of bed, no desire to interact with others, and chronic, obsessive worry. *Id.*

Dr. DePace recorded mostly normal behavioral observations, although he noted Plaintiff's constricted range of affect, his anxious and worried mood, and his preoccupation with his negative mood states and inability to manage them. Tr. at 728. He wrote:

> Overall, during this evaluation, the claimant was able to follow directions without significant difficulties and was clearly able to state his responses on questions asked of him. His presentation and self-report during this evaluation suggested the presence of significant sadness, anxiety, and tearfulness throughout this evaluation, although there was not significant evidence of fearfulness, helplessness, disordered thought, or anger during this evaluation.

*Id.* His diagnostic impressions were severe, recurrent MDD, severe GAD with panic attacks, and severe social anxiety disorder with panic attacks. Tr. at 729.

Plaintiff presented to Stephen Smith, M.D. ("Dr. Smith"), for a consultative medical evaluation on May 23, 2022. Tr. at 730–32. He alleged depression, anxiety, attention deficit hyperactivity disorder ("ADHD"), and psoriatic arthritis. Tr. at 730. He noted he had been diagnosed with psoriatic arthritis in 2017, although he was not currently taking medication for it. *Id.* He described difficulty being on his feet for extended periods, as his feet, ankle joints, and back would start to bother him. *Id.* He endorsed difficulty

getting out of bed due to stiffness and pain. *Id.* He indicated the joints in his hands, wrists, and feet were the worst, although he had pain in his lower back and elbows at times. *Id.* He reported abilities to sit for up to two hours, walk for 30 minutes at a normal pace, and stand for up to two hours without difficulty. *Id.*

Dr. Smith noted Plaintiff's blood pressure was elevated at 145/95 mmHg, and he was obese, as he was 5'7" tall and weighed 268 pounds. Tr. at 731. He observed Plaintiff to ambulate and get on and off the exam table and up and out of a chair without difficulty. *Id.* He noted "multiple areas of well-demarcated erythematous raised lesions[,] as well as some silvery scaling on the elbows" and "on the lower legs and upper extremities." *Id.* Dr. Smith's examination of Plaintiff's spine and extremities produced normal findings, although Plaintiff complained of some discomfort with flexion, extension, and lateral flexion of the lumbar spine and heel and toe walk. *Id.* Dr. Smith wrote: "Overall, the patient performed the exam without any significant physical limitations." *Id.*

On June 23, 2022, state agency medical consultant Alfred Moore, M.D. ("Dr. Moore"), considered evidence of level III obesity and psoriasis and assessed Plaintiff's physical residual functional capacity ("RFC") as follows: occasionally lift and/or carry 50 pounds; frequently lift and/or carry 25 pounds;  stand and/or walk for a total of about six hours in an eight-hour

workday; sit for a total of about six hours in an eight-hour workday; occasionally climb ramps and stairs; never climb ladders, ropes, and scaffolds; frequently balance, stoop, kneel, crouch, and crawl; and avoid concentrated exposure to extreme cold, extreme heat, wetness, humidity, and hazards. Tr. at 74–76.

On June 24, 2022, Plaintiff reported his days were not very structured, as he felt lethargic and was "usually laying on the couch half asleep." Tr. at 761. He indicated he tried to read and be productive, but was unsuccessful. *Id.* He stated he had tried to use coping skills, but found them useless. *Id.* He noted his parents continued to manage and dispense his medications. *Id.*

On June 27, 2022, state agency psychological consultant Timothy Laskis, Ph.D. ("Dr. Laskis"), reviewed evidence regarding Plaintiff's mental impairments and completed a psychiatric review technique ("PRT"). Tr. at 72, 73–74. He considered listings 12.04 for depressive, bipolar, and related disorders and 12.06 for anxiety and obsessive-compulsive disorders and rated Plaintiff's degree of limitation as mild in understanding, remembering, or applying information, moderate in interacting with others, moderate in concentrating, persisting, or maintaining pace, and mild in adapting or managing oneself. *Id.* Dr. Laskis considered "moderately limited" Plaintiff's abilities to: carry out detailed instructions, work in coordination with or in proximity to others without being distracted by them, complete a normal

15

workday and workweek without interruptions from psychologically-based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods, interact with the general public, accept instructions and respond appropriately to criticism from supervisors, and get along with coworkers or peers without distracting them or exhibiting behavioral extremes. Tr. at 76–77.

Plaintiff complained of having no energy during a therapy session on July 1, 2022. Tr. at 762. He said that since his last visit, he had shopped for groceries with his parents, but had been worn out for the rest of the day. *Id.* He explained that he could perform some tasks like reading or making phone calls in the morning, but that certain tasks exhausted him to the point where he could do nothing else. *Id.* He stated he usually was motivated to perform tasks until noon, but could not do anything thereafter. *Id.*

Plaintiff reported feeling extremely anxious during a therapy session on July 8, 2022. Tr. at 764. He explained that there was no pattern to his anxiety, as he often had different levels of anxiety with respect to the same activities from one day to the next. *Id.* He described his anxiety as a feeling of nausea and tension in his chest. *Id.* He expressed being more engaged and motivated and denied suicidal thoughts. *Id.* Joshua Sandler, MSW, LMSW ("SW Sandler"), observed Plaintiff to demonstrate anxious mood and appropriate affect with no significant changes to thought process/orientation

or behavior/functioning. *Id.* He encouraged Plaintiff to continue walking for exercise and bathing and reading at night. *Id.*

On July 13, 2022, Plaintiff endorsed depressed and anxious mood, panic attacks, poor focus, and being easily distracted. Tr. at 766. He requested to be tried on Buspar, as Gabapentin was not helping his anxiety, although his depression was much better. Tr. at 769. NP Morrow recorded mostly normal observations on MSE, aside from depressed, anxious, and worried mood and fair judgment and insight. Tr. at 767. She instructed Plaintiff to taper off Gabapentin by reducing and discontinuing the medication over a two-week period. Tr. at 769. She increased Lamictal to 100 mg daily and started Plaintiff on Buspar with instruction to titrate up his dosage. *Id.*

Plaintiff presented to Free Medical Clinic of Newberry, Inc. ("Newberry Free Clinic"), to establish treatment on July 19, 2022. Tr. at 797. He weighed 273.4 pounds. *Id.* He noted he had been diagnosed with psoriasis six years prior and had not been on immunomodulators. *Id.* The provider noted plaques on Plaintiff's arms and legs, but none on his neck or scalp and no nail changes. *Id.* He assessed psoriasis. *Id.*

Plaintiff reported sleep disturbance during a therapy session on July 22, 2022. Tr. at 770. He felt his poor sleep was caused by the adjustment to his medications. *Id.* He endorsed low energy and motivation, anxiety, and

depressive symptoms. *Id.* SW Sandler noted Plaintiff's mood was dysphoric and he had low motivation, although he was more talkative and engaged during the session. *Id.* He stated Plaintiff had made limited progress and continued to be resistant to trying new coping skills and techniques. *Id.*

On October 18, 2022, Plaintiff requested his provider at Newberry Free Clinic prescribe medication to treat ADHD. Tr. at 796. The provider prescribed Clonidine 0.1 mg. *Id.*

Plaintiff reported his anxiety was "almost gone" on November 22, 2022. Tr. at 772. He indicated he continued to experience some anxiety, but had been able to do more things. *Id.* He said he continued to struggle with following through on activities like reading, but had been more motivated to fill out job applications, cook, clean, and help take care of his parents' dog. *Id.* SW Sandler noted Plaintiff's score on a depression inventory had increased, whereas his score on an anxiety inventory had decreased. *Id.*

On December 20, 2022, Plaintiff reported anxiety due to driving, getting a job, and feeling lonely. Tr. at 773. He stated he experienced distracting thoughts while driving that led to increased anxiety and fear. *Id.* SW Sandler noted Plaintiff's depressed mood, but no other changes. *Id.* He stated Plaintiff had made limited progress. *Id.* He encouraged Plaintiff to use "brown noise" to improve his focus while driving. *Id.*

On February 6, 2023, Plaintiff reported a stable mood with Lamictal, except that he was experiencing much anxiety and some sadness. Tr. at 775. He endorsed depressed and anxious mood, decreased energy, concentration, and interest, low motivation, panic attacks, chronic worry, social anxiety, and feeling overwhelmed. *Id.* NP Morrow recorded normal findings on MSE. Tr. at 776. She added Remeron 30 mg to Plaintiff's medication regimen. Tr. at 777.

Plaintiff requested medication refills and sought to discuss interactions between Clonidine and Mirtazapine on February 15, 2023. Tr. at 793. He was 5'7" tall, weighed 243 pounds, and had a body mass index ("BMI") of 38.1 kg/m.² *Id.* Corey D. Hunt, M.D. ("Dr. Hunt"), prescribed Clonidine HCl 0.1 mg, 180 tablets with three refills. Tr. at 794.

On March 8, 2023, Plaintiff denied side effects and indicated Remeron provided some help, although he continued to experience anxiety, depression, and irritability. Tr. at 778.

On May 16, 2023, Plaintiff presented to Newberry Free Clinic for routine follow up. Tr. at 789. He was 5'7" tall, weighed 229 pounds, and had a BMI of 35.9 kg/m.² *Id.* He requested medication refills and noted he could not be seen by Newberry Mental Health until August. Tr. at 790. Lance Braye, M.D. ("Dr. Braye"), observed erythematous plaques with scaling across Plaintiff's upper and lower extremities. *Id.* He recorded normal psychiatric

observations. *Id.* He prescribed Buspar 30 mg twice a day, Clonidine HCl 0.1 mg twice a day, Lamictal 100 mg, and Trazodone 100 mg. *Id.* He noted Plaintiff was taking Triamcinolone for plaque psoriasis, but noted Methotrexate was preferred given the severity of Plaintiff's symptoms and his preference. *Id.* He indicated Plaintiff could not be switched to Methotrexate without undergoing multiple lab studies. *Id.*

Plaintiff presented to establish mental health treatment at the Laurens Outpatient Clinic on August 11, 2023, after moving from Lexington to Laurens County. Tr. at 448. He denied suicidal and homicidal ideation. Tr. at 449. He tested positive for THC. *Id.* His medications included Trazodone 100 mg, Lamictal 100 mg, and Clonidine 1 mg. *Id.* Counselor Monika McGlohon completed a safety plan with Plaintiff. *Id.*

On August 14, 2023, Plaintiff denied depression and anxiety, reported good sleep, and requested to restart Trazodone. Tr. at 825. NP Morrow recorded normal findings on MSE, aside from worried mood and fair insight and judgment. Tr. at 826. She prescribed Lamictal 100 mg, Trazodone 100 mg, and Strattera 40 mg. *Id.* She noted Plaintiff would be transferred to Laurens Mental Health Center. Tr. at 827.

Plaintiff presented to Good Shepherd Free Medical Clinic ("Good Shepherd Clinic") for evaluation of psoriasis on August 31, 2023. Tr. at 837. He endorsed morning stiffness lasting more than an hour, rated his pain over

the prior week as an eight on a 10-point scale, and rated the overall effect of his arthritic or muscular conditions as a five. Tr. at 839. He reported he had experienced increased joint pain in his wrists, hands, knees, and feet when he attempted to work at Starbucks, although he denied current joint pain. Tr. at 837. Rheumatologist Deborah Meadows, M.D. ("Dr. Meadows"), noted plaque involvement at Plaintiff's forearms, elbows, metacarpophalangeal ("MCP") area, and lower legs from the knees to the feet. *Id.* She found a lesion at Plaintiff's right first toe. *Id.* She assessed plaque psoriasis with possible psoriatic arthritis. *Id.* She noted back pain that could be mechanical versus inflammatory. *Id.* She ordered lab studies and x-rays and prescribed Celebrex 200 mg twice a day and a trial of Taltz. *Id.*

On September 7, 2023, x-rays of Plaintiff's lumbar spine showed mild disc space narrowing at L5–S1 with no other acute changes or obvious malalignment. Tr. at 902. X-rays of his thoracic spine indicated mild degenerative changes of the lower thoracic disc spaces evidenced by mild osteophyte formation and disc space narrowing with no other acute changes. Tr. at 904.

Plaintiff presented to the ER at Laurens County Hospital on September 22, 2023, as he had an injection-site reaction to Taltz. Tr. at 863. He noted it was his third injection, and he had not reacted to the prior injections. Tr. at

21

864. The ER provider noted no evidence of cellulitis or abscess and released Plaintiff with instructions to treat the site with ice packs. Tr. at 864.

On October 19, 2023, Plaintiff endorsed worsened symptoms due to a strep infection, one hour of morning stiffness, a pain rating of nine, and overall functioning as a level of nine with a "10" being "very poorly." Tr. at 997. His provider at Good Shepherd Clinic ordered magnetic resonance imaging ("MRI") studies of his lumbar and thoracic spine. Tr. at 998.

Plaintiff presented to Brynna Holland, MS, APRN ("NP Holland"), at Beckman Center for Mental Health Services ("Beckman Center") for an initial visit on November 7, 2023. Tr. at 1012. He endorsed low motivation, low energy, irritability, difficulty completing tasks, difficulty with organization, distractibility, frequent and early waking, and decreased concentration, but denied suicidal ideation. *Id.* He reported his anxiety was well managed. *Id.* He stated he was using cannabidiol ("CBD") to address worsened pain due to psoriatic arthritis. *Id.* NP Holland noted fair judgment and insight and otherwise normal findings on MSE. Tr. at 1013. She assessed MDD and GAD. *Id.* She prescribed Lamictal 200 mg, Trazodone 100 mg, and Wellbutrin XL 150 mg. Tr. at 1014.

Plaintiff presented to nurse practitioner Angela Thomas ("NP Thomas") at Good Shepherd Clinic for an initial primary care visit on November 14, 2023. Tr. at 993. His blood pressure was elevated at 140/100 mmHg. *Id.* NP

22

Thomas noted that Dr. Meadows had prescribed Lisinopril. *Id.* Plaintiff reported doing well on Lisinopril and doing much better from a psychiatric standpoint. *Id.* He denied suicidal ideations. *Id.* He requested injectable medication, as he was walking 30 to 90 minutes per day and had modified his diet, but continued to binge eat. *Id.* NP Thomas recorded normal findings on exam. *Id.* She continued Lisinopril and instructed Plaintiff to keep his upcoming appointment with Dr. Meadows. *Id.* She explained to Plaintiff that she was not certain that injectable GLP1 medication would be covered by his prescription assistance plan and encouraged him to continue use of Wellbutrin, diet, and exercise and to stop buying junk food and replace it with healthier options. Tr. at 994. She ordered lab studies to evaluate Plaintiff's thyroid-stimulating hormone ("TSH") level. *Id.*

Plaintiff presented to physician assistant Mariah Aden ("PA Aden") at Beckman Center on December 6, 2023. Tr. at 1016. He endorsed low motivation, low energy, irritability, difficulty completing tasks, difficulty with organization, distractibility, decreased concentration, poor sleep, and difficulty sitting still. *Id.* He indicated Gabapentin had helped his anxiety in the past. *Id.* He said Wellbutrin had improved his ADHD symptoms to some extent, but he thought another medication was needed. *Id.* PA Aden recorded normal findings on MSE. Tr. at 1017. She assessed MDD, GAD, and BPD and added Gabapentin 300 mg to Plaintiff's medication routine. Tr. at 1017–18.

On December 6, 2023, an MRI of Plaintiff's thoracic spine was unremarkable, and an MRI of his lumbar spine showed minimal posterior disc bulge at L5–S1 without significant canal or foraminal stenosis. Tr. at 1023–26.

On December 19, 2023, Plaintiff weighed 211.8 pounds. Tr. at 1020. Dr. Meadows noted Plaintiff's skin appeared "much better" and his joints were "a bit better" since initiation of treatment with Taltz. *Id.* Plaintiff rated his joint pain as a four and his back pain as a seven. *Id.* Dr. Meadows assessed psoriasis, psoriatic arthritis, chronic back pain, low-grade fever, ADHD, depression, and restless leg syndrome. *Id.* She continued Taltz, increased Gabapentin, referred Plaintiff to physical therapy, and ordered lab studies and chest x-rays. *Id.*

Plaintiff presented to Katherine Thorpe, MSW, LMSW ("SW Thorpe"), at Beckman Center for an assessment on December 21, 2023, after expressing a desire to add counseling to his treatment plan. Tr. at 1071. He provided responses indicative of moderate impairments in functioning with serious disturbances in social network, community resources, productivity, and managing money. *Id.* He sought help to manage binge eating, reduce disassociation, and return to enjoying hobbies and leisure. *Id.*

On December 27, 2023, a second state agency psychological consultant, Sylvie Ward, Ph.D. ("Dr. Ward"), completed a PRT, considering listing 12.08

for personality and impulse-control disorders, in addition to listings 12.04 and 12.06. Tr. at 83–84, 94–95. She rated Plaintiff's degrees of limitation as mild in understanding, remembering, or applying information and adapting or managing oneself and moderate in interacting with others and concentrating, persisting, or maintaining pace. Tr. at 83, 94. She completed a mental RFC assessment, noting Plaintiff was moderately limited in his abilities to: carry out detailed instructions, work in coordination with or in proximity to others without being distracted by them, complete a normal workday and workweek without interruptions from psychologically-based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods, interact with the general public, accept instructions and respond appropriately to criticism from supervisors, and get along with coworkers or peers without distracting them or exhibiting behavioral extremes. Tr. at 86–87, 97–98.

On January 3, 2024, a second state agency medical consultant, William Crosby, M.D. ("Dr. Crosby"), assessed Plaintiff's physical RFC as follows: occasionally lift and/or carry 50 pounds; frequently lift and/or carry 25 pounds; stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; occasionally climb ramps and stairs; never climb ladders, ropes, and

scaffolds; and frequently balance, stoop, kneel, crouch, and crawl. Tr. at 85–86, 96–97.

On January 25, 2024, Plaintiff reported he had stopped taking Qelbree due to side effects and had restarted Gabapentin 300 mg. Tr. at 1072. He indicated his sleep and restlessness had improved, although he continued to have problems with irritability and mood instability associated with BPD. *Id.* He endorsed anxious mood, poor focus, difficulty completing tasks, and being easily distracted. *Id.* PA Aden recorded normal findings on MSE. Tr. at 1073. She assessed BPD, MDD, GAD, and ADHD and prescribed Abilify, Gabapentin, Wellbutrin XL, and Lamictal. Tr. at 1073–74.

Plaintiff presented to Laurens County Health Outpatient Physical Therapy for an initial evaluation on February 6, 2024. Tr. at 1041. His sensation was intact to light touch. Tr. at 1054. He demonstrated 5/5 strength on bilateral hip flexion, left hip extension, right hip abduction, left hip adduction, right knee flexion and extension, left knee extension, and bilateral shoulder shrug, 4+/5 strength on right hip extension and adduction, 4/5 strength on left hip abduction and knee flexion and right middle and lower trapezius testing, and 4-/5 strength on left middle and lower trapezius testing. Tr. at 1054–55. He demonstrated impaired cervical active range of motion ("ROM") with flexion to 43/45 degrees, extension to 39/50 degrees, left lateral flexion to 30/45 degrees, right lateral flexion to 27/45 degrees, and left

rotation to 54/60 degrees, as well as postural weakness and hypomobility of the thoracic spine. Tr. at 1041, 1055.

On February 7, 2024, Plaintiff met with Kevin Terry, M.Ed., LPC ("Counselor Terry"), to complete an individual counseling assessment and plan of care. Tr. at 1076. Plaintiff denied significant changes in mood/affect, thought process/orientation, motivation, behavior/functioning, medical condition, or substance use and denied suicidal and homicidal ideation and self-harm. *Id.*

On February 15, 2024, Plaintiff reported improvement to his skin, joints, and back. Tr. at 1050. Dr. Meadows noted small palettes of psoriasis on the bilateral elbows and pain with extension of the back. *Id.* She continued Taltz, Gabapentin, Zanaflex, and physical therapy. *Id.*

On March 20, 2024, Plaintiff reported overall improvement in his mood and irritability since starting Abilify 2 mg, but indicated he did not want to increase his dose. Tr. at 1077. He expressed a desire to participate in group therapy. *Id.* PA Aden recorded normal findings on MSE. Tr. at 1078. She refilled Abilify and Wellbutrin XL and substituted Lamictal XR 250 mg for Lamictal 200 mg. Tr. at 1079–80.

Plaintiff completed 10 physical therapy sessions, but was released on March 22, 2024, as his symptoms failed to improve. Tr. at 1041.

27

On May 21, 2024, Plaintiff reported pain in his left thoracic paraspinals with spasms that spread throughout his spine. Tr. at 1034. He said his pain impacted his mood and ability to work. *Id.* Georges Godfrin, MSN, NP ("NP Godfrin"), noted some iliopsoas pain with twisting with arms pinned. *Id.* He assessed hypertension, chronic back pain related to muscle spasm, mood disorder, psoriatic arthritis/psoriasis, and ADHD. Tr at 1034. He refilled Lisinopril and instructed Plaintiff to continue Lamictal and Abilify. Tr. at 1035. Plaintiff expressed concern over liver and kidney effects with his regimen of two Tylenol 650 mg tablets every eight hours, one to two Tizanidine 2 mg three times a day, and Meloxicam 15 mg daily, and noted he had been taking less than the amount prescribed. *Id.* NP Godfrin told him that he could safely take Tylenol, Tizanidine 4 mg three times a day, and Meloxicam as needed. *Id.* He assured Plaintiff that he would monitor his liver and renal function. *Id.* He recommended use of a TENS unit, topical ointments, and ice and heat for pain. *Id.* He ordered a C-reactive protein ("CRP") test that showed inflammatory CRP as <3.0 mg/L. Tr. at 1037.

On May 28, 2024, Plaintiff weighed 232.2 pounds. Tr. at 1031. He endorsed worsening symptoms that included difficulty sleeping, morning stiffness in his hands that lasted for two hours, morning stiffness in his back that lasted for one to two hours, and continued back pain in his left thoracic area that was worsened by sitting, walking, and exercise. *Id.* He rated his

back pain as an eight. *Id.* He reported no real improvement with physical therapy. *Id.* He indicated improvement in his joints on Taltz, although he had continued involvement in his elbows and a rash. *Id.* Dr. Meadows noted psoriasis plaques on the elbows, good flexion, extension, and rotation in Plaintiff's back, and limited straight-leg raise on the right. Tr. at 1032. She referred Plaintiff to pain management for chronic back pain. Tr. at 1030. She discussed changing Plaintiff from Taltz to Humira due to increased psoriasis, joint stiffness, and back pain, although she noted Plaintiff's back pain was more likely due to spondylitis than inflammation. Tr. at 1031. She prescribed a trial of Humira and continued Gabapentin 600 mg three times a day, Zanaflex, and Tylenol 650 mg three times a day. *Id.*

Plaintiff reported his medications were adequately addressing his mood symptoms on July 11, 2024. Tr. at 1082. He expressed a desire to better address his ADHD symptoms, noting he had functioned best on Vyvanse, but could not afford it. *Id.* PA Aden recorded normal findings on MSE. Tr. at 1083. She added Concerta 18 mg to Plaintiff's medication regimen. Tr. at 1085.

Plaintiff met with Counselor Terry to discuss and update his plan of care on July 23, 2024. Tr. at 1086. Counselor Terry noted Plaintiff had met two of his treatment goals and maintained them over time and had made

progress toward his other two goals. *Id.* Plaintiff opted to continue therapy and extend his target dates for meeting his other two goals. *Id.*

On August 1, 2024, Plaintiff indicated he was doing well and had been following closely with mental health. Tr. at 1064. He stated Meloxicam was minimally effective for his pain, but Gabapentin was helping with his moods. *Id.* He denied improvement on Humira. *Id.* Physician assistant Tamika Lang ("PA Lang") recorded normal findings on exam. *Id.* She instructed Plaintiff to replace Meloxicam with Naproxen to see if it helped his pain. *Id.*

On August 15, 2024, Plaintiff reported thoracic and lumbar pain and pain and stiffness in his hands and wrists. Tr. at 1060. He noted no change in his joint pain since he had started Humira a couple of months prior. *Id.* Plaintiff's provider at Good Shepherd Clinic noted tenderness to palpation in the thoracic and lumbar spinous processes. *Id.* He instructed Plaintiff to continue his medications and home exercises. *Id.*

On August 28, 2024, Plaintiff reported improved ADHD symptoms, but increased anxiety since starting Concerta. Tr. at 1087. He expressed a desire to discontinue Concerta, continue Wellbutrin, and start Cymbalta, as his pain management provider had recommended it for mood and pain. *Id.* He endorsed depressed and anxious mood, but denied other psychiatric symptoms. *Id.* PA Aden observed normal findings on MSE, aside from anxious mood and congruent affect. Tr. at 1088. She prescribed Wellbutrin

XL 300 mg, Cymbalta 30 mg, Abilify 2 mg, and Lamictal XR 250 mg. Tr. at 1089.

C.    The Administrative Proceedings

1.    The Administrative Hearing

a.    Plaintiff's Testimony

At the hearing on September 10, 2024, Plaintiff testified he was 5'6" tall and weighed 220 pounds. Tr. at 46. He said he lived alone in a ground-floor apartment. *Id.* He denied having a driver's license and indicated his father drove him to appointments and the grocery store. Tr. at 46–47. He stated he previously had a driver's license for a couple of years while he was a teenager, but surrendered it because driving caused him to have panic attacks. Tr. at 47.

Plaintiff noted his father lived five to 10 minutes away from him and picked him up a few times a week, although they did not spend time with each other at their respective homes. *Id.* He said he had not seen his mother and sister in over 18 months, even though his mother lived with his father and his sister lived nearby. *Id.* He testified his father did his laundry for him. Tr. at 48. He indicated he prepared his own simple meals like rice and ramen and did household chores, although he might sweep the kitchen one day and vacuum the living room another day. *Id.* He confirmed that he had a phone and read books. *Id.* He said he rarely watched television and movies. *Id.* He

indicated he had social media accounts, but said he did not use them. *Id.* He denied having hobbies and pets. Tr. at 49. He stated his father paid for his rent and utilities. *Id.* He denied current use of alcohol, tobacco, and illicit drugs, noting that he had occasionally used alcohol in the past, had smoked for a year while he was in college, and had last used marijuana a few months prior. Tr. at 49–50.

Plaintiff testified he had worked for two days for the county in 2022. Tr. at 50. He stated he had previously worked as a barista at Starbucks and as a research assistant at College of Charleston. *Id.*

Plaintiff stated he was unable to work because his depression was constant and frequently severe. Tr. at 52. He said he had anxiety and felt suicidal at times. *Id.* He testified he was last hospitalized for suicidal thoughts in early 2022. *Id.* He noted he had ADHD, but was unable to treat it, as the medications caused him to be angry. *Id.* He indicated BPD affected his ability to work because he had difficulty dealing with bosses and coworkers. Tr. at 52–53. He said he also had psoriasis and psoriatic arthritis. Tr. at 53.

Plaintiff testified he saw a therapist twice a month and a psychiatrist every two to three months. *Id.* He reported he was taking Lamictal, Wellbutrin, Abilify, and Cymbalta. *Id.* He said the medications were free to him through the Wellvista program. *Id.* He stated his medication regimen

was successful in delaying his depressive episodes, but had not completely prevented them. Tr. at 53–54. He indicated his last major depressive episode had occurred two months prior. Tr. at 54. He described feeling unmotivated and being unable to get out of bed for days. *Id.* He said that when he was able to get out of bed, he remained unable to do anything. *Id.* He noted his anxiety and depression were so bad that he did not want to leave the house. *Id.* He stated he felt "foggy," such that reading was difficult. *Id.* He described anger episodes that affected his relationship with his family. Tr. at 55.

Plaintiff stated a rheumatologist at the Good Shepherd Clinic treated his psoriatic arthritis. *Id.* He said his psoriatic arthritis caused him to feel stiff and to do things slowly when he woke in the morning. Tr. at 56. He indicated he felt pain in some joints throughout the day. *Id.* He claimed he tightened up if he stood or sat the same way for an extended period. *Id.* He stated constantly moving provided some relief, but did not completely resolve his symptoms. *Id.* He described pain mostly in his back, but sometimes in his fingers and knees. *Id.*

Plaintiff admitted he used a computer during a typical day and his psoriatic arthritis sometimes affected his abilities to type and use a mouse. Tr. at 56–57. He stated he experienced two to three bad days per week, when he could not leave the house or sometimes even the bed. Tr. at 57. He said he felt anxious when he had to deal with other people. *Id.* He confirmed he was

generally able to feed and bathe himself, but said he neglected showering, shaving, and caring for his general hygiene when he felt depressed. Tr. at 58.

In response to questions about medication-related side effects, Plaintiff stated Lamictal affected his memory, Abilify caused him to gain weight, and Naproxen "mess[ed his] stomach up," causing upset stomach and vomiting. Tr. at 57–58.

Plaintiff estimated he could lift 20 pounds. Tr. at 58. He said he could walk for up 10 to 15 minutes before stopping, although he would be in pain the whole time. Tr. at 59.

Plaintiff described his panic attacks as involving his "heart rate skyrocket[ing]" and nearly hyperventilating. *Id.* He denied recent suicide attempts, but noted that, in the past, he had attempted suicide by taking pills. *Id.* He noted his psychiatrist had recently adjusted his medication, discontinuing Concerta for ADHD because it was making him too angry, and prescribing Cymbalta for depression, anxiety, and pain. Tr. at 60.

### b.    Witness Testimony

Plaintiff's father, Andre F. ("Witness"), appeared and testified at the hearing. Tr. at 61–63. He said he saw Plaintiff roughly three times a week. Tr. at 62. He stated he did not believe Plaintiff would be able to work. Tr. at 62. He explained that a few weeks prior, Plaintiff had been scheduled for back-to-back appointments. *Id.* He indicated that after Plaintiff finished the

first appointment, he learned the second doctor was running behind such that he would have to wait half an hour. *Id.* He noted Plaintiff became very angry and upset, left the office, started crying, stated Witness loved his dogs more than him, and was "out of it" for the remainder of the day. Tr. at 63. He described an incident when Plaintiff "lost it" in the grocery store parking lot and had to return home. *Id.* He said it was difficult for him to adequately support Plaintiff because during periods of depression and anxiety, Plaintiff did not believe Witness loved him. *Id.* He noted Plaintiff's anxiety manifested when they were in congested traffic, even though Plaintiff was not driving. *Id.*

c.    Vocational Expert Testimony

Vocational Expert ("VE") William Robert Irvin, Sr., reviewed the record and testified at the hearing. Tr. at 64–68. The VE categorized Plaintiff's PRW as a coffee maker and blender, requiring medium exertion and a specific vocational preparation ("SVP") of 2, *Dictionary of Occupational Titles* ("*DOT*") No. 317.684-010, and a cashier, requiring light exertion and an SVP of 2, *DOT* No. 211.462-010. Tr. at 65. The ALJ described a hypothetical individual of Plaintiff's vocational profile who could perform a full range of medium work; occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; frequently balance, stoop, kneel, crouch, and crawl; and perform simple tasks with customary breaks and occasional changes in a routine work

setting. Tr. at 65–66. The VE testified that the hypothetical individual would be able to perform Plaintiff's PRW. Tr. at 66.

The ALJ provided a second hypothetical that modified the first hypothetical to limit the individual to occasional interaction with coworkers, supervisors, and the public. *Id.* The VE testified the person would be unable to perform Plaintiff's PRW, but could perform jobs requiring medium exertion and an SVP of 2 as an order picker, *DOT* No. 922.687-058, a laboratory helper, *DOT* No. 381.687-022, and a cleaner, *DOT* No. 381.687-018, with 162,000, 30,000, and 23,000 positions in the national economy, respectively. Tr. at 66–67.

As a third hypothetical question, the ALJ asked the VE to consider the restrictions in the prior questions, but to assume the individual could occasionally interact with coworkers and supervisors, but never with the public. Tr. at 67. The VE testified the jobs he had previously identified would remain in the same numbers. *Id.*

The ALJ asked the VE to identify employers' general tolerance for off-task behavior. *Id.* The VE testified that if an individual is off-task 10% or more of the time, there would be no work available. *Id.*

The ALJ asked the VE to identify employers' tolerance for absences. *Id.* The VE stated there would be no work available if the individual were absent on two or more days per month on a continuing basis. *Id.*

The ALJ asked the VE if work would be precluded if the individual were off-task for more than 15% of the time, absent from work two or more times per month, or needed an extra hour of unscheduled breaks per day on average. Tr. at 68. The VE stated the restrictions, either individual or in combination, would preclude employment. *Id.*

The ALJ asked the VE if his testimony had been consistent with the *DOT. Id.* The VE responded that his testimony had been consistent, except that his indications regarding variations in climbing, off-task behavior, and absences had been based on his studies, experience, and training. *Id.*

2. The ALJ's Findings

In his decision dated October 24, 2024, the ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through March 31, 2024.
2. The claimant has not engaged in substantial gainful activity since June 25, 2021, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.921 *et seq.*).
3. The claimant has the following severe impairments: depressive disorder, ADHD, anxiety disorder, and obesity (20 CFR 404.1520(c) and 416.920(c)).
4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).
5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except can occasionally climb ramps and stairs but

never climb ladders, ropes or scaffolds. The claimant can frequently balance, stoop, kneel, crouch, and crawl. The claimant can perform simple tasks with customary breaks and occasional changes in a routine work setting. The claimant can occasionally interact with supervisors, coworkers, and the public.

6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.    The claimant was born on April 19, 1995 and was 26 years old, which is defined as a younger individual age 18–49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.    The claimant has at least a high school education (20 CFR 404.1564 and 416.964).

9.    Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568 and 416.968).

10.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11.   The claimant has not been under a disability, as defined in the Social Security Act, from June 25, 2021, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. at 20–32.

II.   Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)    the ALJ failed to adequately consider impairments of BPD, chronic depression, and psoriatic arthritis; and

2)    the ALJ did not evaluate Dr. DePace's opinion in accordance with the applicable regulations.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.     Legal Framework

1.     The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether he has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[2] (4)

---

[2] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404,

whether such impairment prevents the claimant from performing PRW;[3] and (5) whether the impairment prevents him from doing substantial gainful employment. *See* 20 C.F.R. §§ 404.1520s, 416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, §§ 404.1520(a), (b), 416.920(a), (b); Social Security Ruling ("SSR") 82-62 (1982).

---

subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. §§ 404.1525, 416.925. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii), 416.920(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. §§ 404.1526, 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[3] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h) and § 416.920(h).

The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

2.     The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*;

*Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that his conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.    Analysis

    1.    Consideration of BPD, Chronic Depression, and Psoriatic Arthritis

Plaintiff argues the ALJ failed to mention BPD and psoriatic arthritis, despite documentation of both impairments in his medical records. [ECF No. 12 at 2–3]. He notes the ALJ found no physical impairment, despite lab results that confirmed psoriatic arthritis, observations of a chronic rash, and his complaints to his providers of chronic back pain, difficulty sleeping, morning stiffness, and increased pain upon sitting. *Id.* at 3, 5; ECF No. 14 at 1, 2. He claims the ALJ failed to consider his symptoms of chronic depression including sleep impairment, inability to concentrate, and recurring thoughts of death or suicide, in accordance with the Fourth Circuit's decision in *Shelley C. v. Commissioner of Social Security Administration*, 61 F.4th 341 (2023). *Id.* at 3; ECF No. 14 at 1, 3. He maintains the ALJ declined to address BPD despite records from Beckman Center that described the impairment, social anxiety, and lack of concentration. *Id.* at 5. He asserts the ALJ erred in referencing his noncompliance with medications, as he has never been noncompliant with medications. *Id.* at 3; ECF No. 14 at 4.

The Commissioner argues the ALJ carefully considered Plaintiff's mental impairments and accounted for them in the RFC assessment. [ECF No. 13 at 6]. He maintains the ALJ noted Plaintiff's alleged symptoms, but

pointed to specific records indicating his self-reports and his providers' observations of normal findings. *Id.* at 6–7. He asserts Plaintiff's argument that the ALJ neglected evidence of symptoms and diagnoses strays from the scope of review, as Plaintiff is not arguing the ALJ's decision lacks support, but is, instead, offering evidence he believes would lead to a different conclusion. *Id.* at 8.[4]

The ALJ is tasked with evaluating the severity of the claimant's impairments at the second step of the disability evaluation process. 20 C.F.R. §§ 404.1520(c), 416.920(c). A severe impairment "significantly limits [a claimant's] physical or mental ability to do basic work activities," 20 C.F.R. § 404.920(c), whereas "[a]n impairment or combination of impairments is found 'not severe' and a finding of 'not disabled' is made at [step two] when the medical evidence establishes only a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work even if the individual's age, education, and work experience were specifically considered (i.e., the person's impairment(s) has no more than a minimal effect on his or her physical or mental ability(ies) to perform basic work activities)." SSR 85-28.

---

[4] The Commissioner did not address psoriatic arthritis, physical impairments, or Plaintiff's alleged noncompliance in his brief. *See generally* ECF No. 13.

An ALJ's error in assessing the severity of an impairment may be harmless, provided she assesses at least one impairment as severe and moves to the third step of the evaluation process. *See Carpenter v. Astrue*, 537 F.3d 1264, 1266 (10th Cir. 2008) ("[A]ny error here became harmless when the ALJ reached the proper conclusion that [claimant] could not be denied benefits conclusively at step two and proceeded to the next step of the evaluation sequence.").

However, for an error in evaluating an impairment's severity to be considered harmless, the ALJ must remedy the error by considering the functional limitations the impairment imposes in assessing the claimant's RFC, if the claimant's impairment fails to meet or equal a listing. *See Washington v. Astrue*, 98 F. Supp. 2d 562, 580 (D.S.C. 2010) (providing that the court "agrees with other courts that find no reversible error where the ALJ does not find an impairment severe at step two provided that he or she considers that impairment in subsequent steps"). In assessing the RFC, the ALJ must "consider all of the claimant's 'physical and mental impairments, severe and otherwise, and determine, on a function-by-function basis, how they affect [the claimant's] ability to work.'" *Thomas v. Berryhill*, 916 F.3d 307, 311 (4th Cir. 2019) (quoting *Monroe v. Colvin*, 826 F.3d 176, 188 (4th Cir. 2016)); *see also* 20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2) (providing the

adjudicator should consider all the medically-determinable impairments of which he is aware, including those that are not "severe").

Here, the ALJ's findings at step two are terse. She merely states she finds depressive disorder, ADHD, anxiety disorder, and obesity to be severe impairments and writes: "The above medically determinable impairments significantly limit the claimant's ability to perform basic work activities as required by SSR 85-28." Tr. at 20. She ignores psoriatic arthritis and BPD in the severe impairment analysis, despite the impairments having been diagnosed by treating physicians based on observations and clinical findings.

While the ALJ did not mention psoriatic arthritis at step two, she subsequently addressed the impairment, explaining her reasons for concluding it posed no greater restrictions than those she included in the RFC assessment. The ALJ acknowledged Plaintiff's allegations that "he has pain from the psoriatic arthritis in the wrists and knees," "pain sitting and standing," "pain in his hands," "pain when he wakes up," "cannot sit or stand because [h]is back tightens up," and pain that "'can make it more difficult' to use a computer." Tr. at 22–23. However, she found Plaintiff's allegations were "not entirely consistent with the medical evidence and other evidence in the record." Tr. at 24. She noted the record lacked evidence of complaints of or treatment for physical complaints prior to Plaintiff's consultative exam with Dr. Smith in May 2022. *Id.* She acknowledged that Plaintiff had advised Dr.

Smith that he had been diagnosed with psoriatic arthritis in 2017, but had been on no medications for it. *Id.* She discussed Dr. Smith's findings of preserved deep tendon reflexes, no sensory deficits, no lower extremity edema, no cyanosis or clubbing, 5/5 grip strength and good fine and gross manipulative skills bilaterally, no swelling, deformity, tenderness to palpation, or loss of ROM in the MCP joints, full ROM of the elbows, shoulders, and wrists, normal lumbar flexion, extension, and lateral flexion, normal ROM of the hips, knees, and ankles, negative seated SLR test, 5/5 muscle strength in all proximal muscle groups, no atrophy, and ability to walk without an assistive device. *Id.* She noted Dr. Smith's observations were consistent with Dr. DePace's observations on physical exam and other physical exams in the record. *Id.* She cited Dr. Smith's impression that Plaintiff "performed the exam without any significant physical limitations." *Id.* She acknowledged a treatment record around this same time that documented psoriasis on Plaintiff's arms and legs, but did not indicate a diagnosis of psoriatic arthritis. *Id.* She recognized that psoriatic plaques were noted in 2023 records from Good Shepherd Clinic, but that Plaintiff had no joint deformity or edema. Tr. at 24–25. She noted "tests to address these concerns that were normal," although Plaintiff was referred for follow up that resulted in treatment with Taltz and his reports of improvement. Tr. at 25–26. The ALJ explained that in assessing Plaintiff's RFC, she had considered

Plaintiff's "skin/immune impairment" and his "pain complaints" in combination with obesity and noted that the combination of impairments "cause more pain and limitations than might be expected from [each] impairment alone." Tr. at 26. She allocated persuasive authority to Dr. Smith's impressions that Plaintiff had no significant physical limitations. Tr. at 29. Given the ALJ's reasoning and in the absence of further explanation from Plaintiff, the undersigned finds no merit to his allegation that the ALJ failed to consider psoriatic arthritis.

In contrast, the ALJ did not address BPD in explaining the RFC assessment. *See* Tr. at 25–29. The National Institute of Mental Health explains:

> Borderline personality disorder is a serious mental illness that affects how a person feels about themselves and others and makes it hard to function in everyday life. The disorder often involves difficulty regulating emotions, leading to impulsivity, an unstable or often changing sense of self, and troubled relationships with others.

National Institute of Mental Health, *Borderline Personality Disorder*, https://www.nimh.nih.gov/health/publications/borderline-personality-disorder (last visited Dec. 19, 2025). It further specifies that "[p]eople with borderline personality disorder often experience intense mood swings and uncertainty about how they see themselves," quickly change interests, values, and feelings, and tend to view things in extremes, such as "all good" or "all bad,"

leading to swings in social interactions from extreme closeness to extreme dislike and resulting in unstable relationships and emotional pain. *Id.*

The record reflects significant evidence of BPD that the ALJ ignored in assessing Plaintiff's RFC. It shows that Dr. Kruse diagnosed Plaintiff with BPD based on the diagnostic criteria specified above. *See* Tr. at 499–500, 634. While the ALJ noted some negative interactions between Plaintiff and medical providers and Plaintiff's rejection of certain treatments, she did not consider that these actions were consistent with his BPD diagnosis. In fact, the record reflects multiple incidents in which Plaintiff had conflicts with or declined recommendations from his treatment providers. *See* Tr. at 422 (expressing resistance to recommendation to meet with a nutritionist), 426 (reflecting Plaintiff's desire not to participate in counseling), 454 (ER visit following strained conversation with LCCMHC staff over medications and suicidal ideations), 714 (irritable and angry during telephone visit with NP Whatley), 719 (noting Plaintiff's "irate" behavior and refusal to discuss reasons for his hospitalization). The record further reflects Plaintiff's combative and strained relationships with his family members and his lack of interaction with others. *See* Tr. at 47 (testifying he had not seen his mother or sister in 18 months, despite the fact that his mother lived with his father and his sister lived nearby), 62–63 (reflecting Plaintiff's father's testimony that Plaintiff often insinuated he did not love him and his description of a

recent incident during which Plaintiff became irate, argumentative, and left the doctor's office when told he would have to wait longer than anticipated), 496 (reporting he argued with his uncle and pushed his parents when they denied him access to the safe where his medications were kept), 726 (indicating he last dated in 2016), 726 (denying communicating with others online and through social media and stating no desire to interact with others). It includes Plaintiff's reports of irritability, mood instability, and binge eating. *See* Tr. at 778, 993, 1012, 1016, 1072. It reflects SW Thorpe's assessment of serious disturbances in social network and community resources and indicates Plaintiff sought her help to manage his binge eating, reduce disassociation, and return to enjoying hobbies and leisure. Tr. at 1071. As none of this evidence was mentioned or resolved, the undersigned cannot find that the ALJ considered Plaintiff's BPD in assessing his RFC.

The ALJ did not err in her evaluation of MDD at step two, as she assessed "depressive disorder" among Plaintiff's severe impairments, but her decision is improperly grounded on an absence of objective evidence to support his complaints of chronic depression, neglects evidence contrary to her conclusion, and fails to reconcile conflicting evidence. The Fourth Circuit has held that ALJs cannot rely upon the absence of objective medical evidence to discredit a claimant's allegations regarding chronic depression, as it is a condition that does not produce objective evidence. *Shelley C.*, 61 F.4th

at 361. "Ultimately, because of the unique and subjective nature of MDD, subjective statements from claimants 'should be treated as evidence substantiating the claimant's impairment.'" *Arakas v. Commissioner, Social Security Administration*, 983 F.3d 83, 97–98 (4th Cir. 2020).

"An ALJ has the obligation to consider all relevant medical evidence and cannot simply cherrypick facts that support a finding of nondisability while ignoring evidence that points to a disability finding." *Lewis v. Berryhill*, 858 F.3d 858, 869 (2017) (quoting *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010)). In *Shelley C.*, the court noted the ALJ erred in "focus[ing] on Shelley C.'s 'improved' periods to reject the lower, more frequent states of her depression which impacted her ability to adapt or manage herself. *Id.*, 61 F.4th at 367.

Although the ALJ appropriately noted Plaintiff's denial of depression and suicidal ideation in more recent records, she neglected the waxing and waning of his depressive symptoms over time and declined to address significant evidence supporting greater impairment to Plaintiff's mental functioning. For example, the record reflects that in January 2022, pursuant to a safety plan, Plaintiff's father agreed to take control of and dispense his medications to prevent him from overdosing." Tr. at 430. Plaintiff's parents continued to control and dispense his medications over an extended period. *See* Tr. at 496, 761. Throughout the record, even when Plaintiff denied

depression or suicidal ideation, he continued to endorse depressive symptoms that included sleep disturbance, lack of motivation, lethargy, low energy, and trouble concentrating. *See* Tr. at 389, 430, 714, 761, 762, 770, 775, 1012, 1016. The ALJ did not thoroughly evaluate the functional limitations imposed by MDD, as she neglected Plaintiff's reports of these continued depressive symptoms.

Contrary to Plaintiff's assertion, it was not unreasonable for the ALJ to consider "inconsistencies in the medication use," as she referenced his reports to his providers of having discontinued, neglected to use, or reduced medications on his own. *See* Tr. at 24 ("It also noted that he 'forgets to use cream each day' (Exhibit 15F)."), 25 ("Although the claimant had additional prescription medications that were documented in 2024, he admitted not taking the medications he had available concurrently."), 26 ("The claimant stated that medications that had been effective for him he does not take when not working."), 27 ("The claimant had concerns over an interaction with medications, so he had not started taking Mirtazapine (Remeron), which this provider noted to be prescribed once daily at bedtime (Exhibit 15F)."). However, the ALJ was not permitted to rely on Plaintiff's noncompliance to reject his allegations without considering his reasons for noncompliance. *See* SSR 16-3p, 2017 WL 5180304, at *9 ("[I]f the frequency or extent of the treatment sought by an individual is not comparable with the degree of the

individual's subjective complaints, or if the individual fails to follow prescribed treatment that might improve symptoms, we may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record. We will not find an individual's symptoms inconsistent with the evidence in the record on this basis without considering possible reasons he or she may not comply with treatment or seek treatment consistent with the degree of his or her complaints."). The ALJ erred to the extent that she neglected this critical step.

For the reasons discussed above, the undersigned recommends the court find substantial evidence fails to support the ALJ's consideration of Plaintiff's BPD and MDD and their limiting effects.

### 2.    Medical Opinions

Following his consultative exam, Dr. DePace wrote: "[Plaintiff's] description of struggles associated with these conditions appear to be longstanding and have apparently severely limited his ability to maintain employment on a sustained basis." Tr. at 729. He further elaborated:

> Cognitively, while the claimant clearly has the ability to perform all higher-order activities of daily living and all complex three-step commands, his chronic and severe struggles with depressed mood and anxiety, as well as accompanying symptoms, likely prevent him from utilizing his cognitive abilities to perform such activities (e.g., impairments with attention, processing speed, distractibility, motivation). Interpersonally, the claimant appears to have long struggled with being able to appropriately and effectively interact with others due to severe struggles with

53

depressive symptomatology, excessive worry, and a severe social anxiety disorder. Given the apparent severity and chronicity of the claimant's struggles as discussed in this report, it appears that he would benefit from receiving assistance in the management of any funds that he has in his possession. Finally, there was no significant evidence obtained during this evaluation that suggested that the claimant was attempting to fabricate problems or exaggerate existing ones.

*Id.*

Plaintiff argues the ALJ failed to consider the supportability and consistency of Dr. DePace's opinion, given findings from his treating mental health providers. [ECF No. 12 at 4–5]; [ECF No. 14 at 5–6]. He maintains Dr. DePace's opinions and observations suggest he is disabled. *Id.* at 4; ECF No. 14 at 1, 3–4.

The Commissioner argues substantial evidence supports the ALJ's evaluation of the opinion evidence. [ECF No. 13 at 10]. He notes the ALJ's decision includes the requisite logical bridge explaining why she found Dr. DePace's opinion only partially persuasive, and the decision must be read as a whole. *Id.* at 11. He maintains the ALJ was not required to base his RFC findings on any medical opinion. *Id.* at 12.

"If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the medical opinion was not adopted." SSR 96-8p, 1996 WL 374184, at *7. The regulations require the ALJ to evaluate all the medical opinions of record based on these factors: (1) supportability;

(2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors that tend to support or contradict the medical opinion. 20 C.F.R. §§ 404.1520c(b), (c), 416.920c(b), (c). However, they only require the ALJ to discuss in the decision the supportability and consistency of each medical source's opinion, as those two factors are considered most important to the evaluation of a medical opinion's persuasiveness. 20 C.F.R. §§ 404.1520c(a), (b)(2), 416.920c(a), (b)(2). "Supportability is the degree to which a provider supports their opinion with relevant, objective medical evidence and explanation, and consistency is the degree to which a provider's opinion is consistent with the evidence of other medical and non-medical sources in the record." *Oakes v. Kijakazi*, 70 F.4th 207, 212 (2023).

ALJs are afforded some discretion in evaluating the persuasiveness of medical opinions, but substantial evidence must support the ALJ's conclusions as to the supportability and consistency factors. If the ALJ obviously errs in evaluating these factors, the court may remand the case. *See Flattery v. Commissioner of Social Security Administration*, C/A No. 9:20-2600-RBH-MHC, 2021 WL 5181567, at *8 (D.S.C. Oct. 21, 2021) (concluding substantial evidence did not support the ALJ's evaluation of the supportability factor where he ignored the claimant's continuing treatment with the medical provider and portions of the provider's treatment notes), *R&R adopted by* 2021 WL 5180236 (Nov. 8, 2021); *Joseph M. v. Kijakazi*, C/A

No. 1:20-3664-DCC-SVH, 2021 WL 3868122, at *13 (D.S.C. Aug. 19, 2021) (finding the ALJ erred in assessing a medical opinion pursuant to 20 C.F.R. § 404.1520c and § 416.920c because he misconstrued the date the plaintiff last saw the medical provider, neglected the continuing treatment relationship, and erroneously claimed the last treatment visit was prior to the plaintiff's alleged onset date), *R&R adopted by* 2021 WL 3860638 (Aug. 30, 2021).

The ALJ summarized findings from Dr. DePace's exam, writing:

The claimant had a consultative psychological examination in May 2022. During that examination, the claimant was living with his parents after a recent hospitalization and admitted attending college for an extended period but leaving just short of completing his degree. The claimant reported suicidal ideation being a factor in his inability to work; however, he reported last working in Starbucks in May 2021, but he also reported that this work was for just brief periods. He stated that he typically has an unstructured day, which he reported to be bad for his anxiety; however, he acknowledged sometimes doing yard work or household chores. He stated that he uses his phone to access the internet and reported a history of being prescribed multiple medications. The claimant stated that Trazodone, at that point, helped his sleep, and he acknowledged that the current medication for his anxiety was not helping. The claimant stated that medications that had been effective for him he does not take when not working. The claimant seemed quite preoccupied about his negative mood states and his inability to manage them over the past few years according to the examiner. However, the report notes that his presentation and self-report during this evaluation suggested the presence of significant sadness, anxiety, and tearfulness throughout this evaluation, although there was no significant evidence of fearfulness, hopelessness, disordered thought, or anger during this evaluation (Exhibit 8F).

Tr. at 26.

The ALJ subsequently evaluated Dr. DePace's opinion as follows:

The report in Exhibit 8F is only partially persuasive. Although the claimant reportedly has "the ability to perform all higher-order activities of daily living and complex three-step commands," it is noted that symptoms prevent those activities from being performed with a vague description of what he still can perform. The report suggests residual abilities to perform some work activities but "severely limited" ability to maintain employment as noted in one portion of the report is not consistent with the clinical findings in this report or the remainder of the treatment evidence. It is noted that the claimant does utilize the Internet on his phone and the report relies a great deal on his inpatient history for support, while noting that he does not take medications when he is not working.

Tr. at 29.

The ALJ's explanation for his consideration of Dr. DePace's opinion does not comply with 20 C.F.R. § 404.1520(c) and 416.920(c), as it reflects the same cherrypicking of the evidence addressed above. The ALJ erred in dismissing Dr. DePace's statement as unsupported based on its reliance on Plaintiff's subjective statements, as Plaintiff's statements were evidence substantiating his impairment. *See Arakas*, 983 F.3d at 97–98. Dr. DePace's opinion was further supported by Plaintiff's tearfulness, sadness, and anxious behavior during the exam and the records Dr. DePace reviewed prior to the exam. The ALJ offers only a cursory explanation of his evaluation of the consistency factor, ignoring the treatment records discussed above that document findings consistent with Dr. DePace's opinion, and failing to explain how Dr. DePace's opinion was inconsistent with the other evidence of

record, particularly Plaintiff reports to his providers and his providers'
impressions.

The ALJ erred in declining to accord persuasive authority, in part, due
to perceived "vague descriptions" in Dr. DePace's opinion. The undersigned
disagrees with the ALJ's assessment of Dr. DePace's descriptions as vague,
as Dr. DePace indicated that Plaintiff's distractibility, reduced processing
speed, decreased attention and motivation, and inability to appropriately
interact with others resulted in no useful ability to function in those areas on
a regular and continuing basis.

However, even if the ALJ did not draw the same conclusion as the
undersigned, he was not permitted to find Dr. DePace's opinion lacked
persuasive authority based on its ambiguity. The Fourth Circuit has
previously found fault in an ALJ's rejection of a consultative examiner's
opinion as "ambiguous," explaining "to the extent" the medical provider's
"recommendation was ambiguous, the medical record is incomplete and the
ALJ should [have] 'take[n] additional actions' to seek clarification." *Oakes*, 70
F.4th at 213. The court wrote: "Accordingly, when an administratively
ordered consultative examiner's opinion contains what ought to be an easily
clarified ambiguity on a key issue, it logically follows that an ALJ must

58

engage in a simple § 404.1520b(b)(2) inquiry."[5] *Id.* at 214. Because the ALJ failed to seek clarification from Dr. DePace as to the "vague descriptions of what [Plaintiff] could still perform," he should not have rejected Dr. DePace's opinion as vague.

Given the foregoing, the undersigned recommends the court find substantial evidence does not support the ALJ's evaluation of Dr. DePace's opinion.

III.    Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned recommends, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under sentence four of 42 U.S.C. § 405(g), that this matter be reversed and remanded for further administrative proceedings.

---

[5] Pursuant to 20 C.F.R. § 404.1520b(b)(2), if the evidence is consistent, but insufficient to allow the adjudicator to make a disability finding, the ALJ may recontact the medical source, request additional existing evidence, order a consultative exam, or request more information from the claimant or others.

IT IS SO RECOMMENDED.

December 22, 2025                    Shiva V. Hodges
Columbia, South Carolina            United States Magistrate Judge

**The parties are directed to note the important information in the attached "Notice of Right to File Objections to Report and Recommendation."**

### Notice of Right to File Objections to Report and Recommendation

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).